(No. 67434.

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. DANIEL J. EDWARDS, Appellant.

*Opinion filed May 30, 1991.—Modified on denial of rehearing September 30, 1991.*

CALVO, BILANDIC and FREEMAN, JJ., took no part.

Charles M. Schiedel, Deputy Defender, and Patricia G. Mysza and M. Jeffrey Bergschneider, Assistant Defenders, of the Office of the State Appellate Defender, of Springfield, for appellant.

Neil F. Hartigan, Attorney General, of Springfield (Robert J. Ruiz, Solicitor General, and Terence M. Madsen, Sally L. Dilgart and William P. Pistorius, Assistant Attorneys General, of Chicago, of counsel), for the People.

JUSTICE CLARK delivered the opinion of the court:

Defendant, Daniel Edwards, and Nancy Rish were arrested on September 4, 1987, in connection with the kidnapping of Stephen Small. Late that evening, at approximately 10 p.m., defendant led police to Mr. Small's body, buried in an underground box in a densely wooded area near his home in Kankakee, Illinois. The Kankakee County grand jury subsequently returned a 13-count indictment on October 1, 1987. Counts I, II and III charged defendant with first degree murder (Ill. Rev. Stat. 1985, ch. 38, pars. 9—1(a)(1) through (a)(3)) and counts IV through XIII charged defendant with aggravated kidnapping for knowingly and secretly confining Mr. Small in an underground box and thereby killing him (Ill. Rev. Stat. 1985, ch. 38, pars. 10—2(a)(1), (a)(3) through (a)(5)). On defendant's motion, defendant's and Rish's trials were severed. The jury returned general verdicts of guilty on both offenses. Defendant was sen-

tenced to death by the circuit court of Kankakee County after the jury found that there were no mitigating factors sufficient to preclude imposition of the death penalty. Execution was stayed (134 Ill. 2d R. 609(a)) pending appeal to this court (Ill. Const. 1970, art. VI, §4(b); Ill. Rev. Stat. 1985, ch. 38, par. 9—1(i); 134 Ill. 2d Rules 603, 605).

The following is an abbreviated summary of the facts leading to defendant's arrest. Mr. Small and his family lived in Kankakee, Illinois. On September 2, 1987, at approximately 12:30 a.m. Mr. Small received a telephone call at his home from an individual who identified himself as a member of the Kankakee police force. The caller told Mr. Small that his business office had been burglarized and that he was needed at the office immediately. Mr. Small left his home.

At approximately 3:30 a.m., Nancy Small, Mr. Small's wife, received a telephone call at the Small home from an unidentified male who told her that her husband had been kidnapped. Mrs. Small then heard her husband's voice telling her that he had been handcuffed inside a box buried under a few feet of sand in the ground. Mr. Small told his wife to contact the family attorney and investment manager and obtain $1 million for ransom money the kidnapper was demanding. Mrs. Small contacted family members and the Kankakee police and FBI agents were notified of the kidnapping.

That evening, at 5:03 p.m., Mrs. Small received a second telephone call from an unidentified male. Mrs. Small heard her husband giving her directions for the delivery of the ransom money. According to Mr. Small, she would receive a map in the mail with which to find him if everything "check[ed] out." From a recording device they had installed on the telephone in the Small home (a trap), the FBI traced the call to a telephone booth at a service station in Aroma Park, Kankakee.

At 5:40 p.m., Jean Alice Small, Mr. Small's aunt, telephoned the Small home to relay a telephone conversation she had had minutes earlier. Jean Small repeated the conversation to Mrs. Small's brother-in-law, who was at the Small home with Mrs. Small at the time. The telephone call was recorded by the trap on the telephone.

According to Jean Small, an unidentified male told her that he knew the Small telephone was tapped. The caller told Jean Small that he made his living from wealthy people who lived in small towns. The caller told Jean Small that Mr. Small was buried in the ground and if the caller saw police officers there would be a "shoot out" or a "blood bath," he would leave town and Mrs. Small would never know where her husband was buried. The caller threatened to "kill [Jean Small's] husband too" in the event she "f*** up."

After the 5:03 p.m. telephone call from Aroma Park, the FBI arranged for surveillance of the area. At approximately 11:28 p.m., Mrs. Small received another ransom call from an unidentified male. This call was also traced to a telephone booth in Aroma Park, although not the one from which the 5:03 p.m. call had originated. FBI Agent Mike Evans and his partner arrived at the telephone booth shortly after the 11:28 p.m. telephone call was placed. Evans saw a white male at the telephone. He also saw an automobile in the area of the booth and recorded the license number. Evans saw a white female with shoulder length blonde hair in the driver's seat of the automobile. After the call was made, the agents saw the automobile make a U-turn and drive away. The agents attempted to follow the automobile but lost it almost immediately.

A fourth ransom call was made to the Small home at 11:46 p.m., but the call was not recorded. This call originated from a public telephone booth in Kankakee which was not under police surveillance. The male caller told

Mrs. Small, "You called the police," and repeatedly claimed, "You f*** up." The caller refused her offer to leave the ransom money. At 11:50 p.m., an Illinois State police officer saw the same automobile spotted by Agent Evans with its trunk partially open, driving away from Kankakee towards Aroma Park.

The Kankakee police department ran a check on the license number Agent Evans had recorded. The search revealed that the automobile was registered to Rish and that her address was 920 South Greenwood, Kankakee. This information was disseminated to the police officers and FBI agents investigating the kidnapping. A police officer familiar with Rish informed the other officials that she was defendant's girlfriend and that the couple lived together at 756 Stratford Drive East, Kankakee.

Police officers began surveillance of the Stratford residence late in the evening on September 2. At 1:20 a.m. on September 3, Rish's automobile, with its trunk partially open, arrived at the residence. Defendant and Rish exited the car and went inside. A white van was parked in front of the residence. A neighbor of the Smalls had told police earlier that day that she had seen a white van parked in the street in front of the Small home at approximately 3 a.m. on September 2.

On September 3, Master Sergeant William Willis of the Illinois State police appeared before a circuit court judge and requested a search warrant for the residence and attached garage located at 756 Stratford Drive East. As part of this request, Willis prepared a complaint for the search warrant containing an affidavit stating the facts which led Willis to believe that items taken in the course of the kidnapping were located at the residence. The judge signed the complaint and the warrant and notarized the affidavit.

The search warrant was executed the following day, September 4, at approximately 10:35 a.m. Police entered

the house and immediately frisked and handcuffed defendant. Defendant was asked if anyone else was in the house and he indicated Rish was upstairs getting dressed. The police then told defendant they were authorized to execute a search of the house and showed defendant the warrant. At that point defendant was taken out of the house and escorted to a police car. Police drove defendant to the Kankakee County Detention Center and placed him in a holding cell. Rish was similarly escorted to the police department. After defendant and Rish had been removed from the house, Detective Robert Anderson and members of the Kankakee police department executed the search warrant. Defendant was subsequently indicted for the kidnapping and murder of Mr. Small.

Defendant raises numerous issues in his appeal regarding his conviction and sentence.

Prior to the severance of their cases, defendant and Rish filed pretrial motions to quash their arrests. A hearing was conducted, at the conclusion of which the trial court denied the motions to quash. Defendant now argues that although the police lawfully entered his home to execute the search warrant, they lacked probable cause to arrest him.

For fourth amendment purposes, a warrant to search for contraband, founded on probable cause, implicitly carries with it the authority to detain occupants of the premises while the search is being conducted. (*Michigan v. Summers* (1981), 452 U.S. 692, 69 L. Ed. 2d 340, 101 S. Ct. 2587.) If, in the course of the search, evidence establishing probable cause to arrest one or more of the occupants of the house is found, an arrest and a search incident thereto are constitutionally permissible. *Summers*, 452 U.S. at 705, 69 L. Ed. 2d at 351, 101 S. Ct. at 2596.

Arrests made independently of a search for contraband or evidence require a separate analysis. Warrantless felony arrests made in a public setting have been held to be constitutionally permissible as long as there is probable cause to support the arrest. (*United States v. Watson* (1976), 423 U.S. 411, 46 L. Ed. 2d 598, 96 S. Ct. 820.) In *Payton v. New York* (1980), 445 U.S. 573, 63 L. Ed. 2d 639, 100 S. Ct. 1371, the Court considered the circumstances under which police officers may enter a private residence to make a routine felony arrest without first obtaining a warrant. There, the Court held that the fourth amendment prohibits the police from making a warrantless and nonconsensual entry into a suspect's home in order to make a routine felony arrest. (*Payton*, 445 U.S. at 576, 63 L. Ed. 2d at 644, 100 S. Ct. at 1374-75.) The Court rejected the suggestion that only a search warrant would adequately protect the privacy rights at stake and concluded that either a search or an arrest warrant first be obtained before entry into a private residence is allowed to execute an arrest. *Payton*, 445 U.S. at 603, 63 L. Ed. 2d at 661, 100 S. Ct. at 1388; see *People v. Abney* (1980), 81 Ill. 2d 159.

In the instant case, police officers lawfully entered defendant's home pursuant to the September 3 search warrant. Defendant, however, was not detained on the premises while the search was conducted, but was instead handcuffed and escorted by police to the Kankakee police station prior to the execution of the warrant. In light of the circumstances under which defendant was arrested, we need not consider whether probable cause to arrest defendant was turned up in the search executed pursuant to the warrant. Rather, we need only address the issue of whether probable cause existed to support the felony arrest in defendant's home.

This court has defined probable cause to arrest as existing where the police "have knowledge of facts which

would lead a reasonable man to believe that a crime has occurred and that it has been committed by the defendant." *(People v. Eddmonds* (1984), 101 Ill. 2d 44, 60; see *People v. Wright* (1985), 111 Ill. 2d 128, 145; see also *Dunaway v. New York* (1979), 442 U.S. 200, 208 n.9, 60 L. Ed. 2d 824, 833 n.9, 99 S. Ct. 2248, 2254 n.9; *Brinegar v. United States* (1949), 338 U.S. 160, 175-76, 93 L. Ed. 1879, 1890, 69 S. Ct. 1302, 1310-11.) As this court observed in *People v. Wright*:

> "[D]ecisions analyzing the probable cause standard reveal that it is a 'practical, nontechnical conception.' [Citation.] 'In dealing with probable cause, *** we deal with probabilities. These are not technical; they are factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians act.' [Citations.]" *Wright*, 111 Ill. 2d at 146.

Our review of the record persuades us that the police had probable cause to arrest defendant at the time the police entered his home with a search warrant. At the time of his arrest, police officers knew that Mr. Small had been kidnapped from his home in the early morning hours of September 2, and that a white van had been near the Small home at approximately 3 a.m. that morning. The officers knew that defendant was the owner of a white van. The officers knew that Mrs. Small had received a ransom call from an unidentified male at 11:28 p.m. made from a pay phone in Aroma Park, and that a man matching defendant's description had been seen by FBI agents standing at the telephone at that time. That man was then observed driving off in a car with a female companion with blonde hair, which car was later identified as being owned by Rish, a woman with shoulder length blonde hair. Police officers had seen defendant and Rish entering the residence at 756 Stratford Drive East in Rish's automobile at 1:20 a.m., September 3. The officers knew that defendant and Rish lived to-

gether at the Stratford residence and defendant's white van was seen parked in front of the home when defendant and Rish arrived there on the morning of September 3. In the instant case, there was no doubt that a crime had been committed and that the police were in possession of sufficient knowledge to believe that defendant had committed the crime. Our review of the record therefore persuades us that the police had probable cause to arrest defendant at the time police entered his home with a search warrant. See *Eddmonds*, 101 Ill. 2d at 60; see also *Wright*, 111 Ill. 2d at 147.

Moreover, we find support for our conclusion in the appellate court opinion in *People v. Kite* (1981), 97 Ill. App. 3d 817, 827. When the police in *Kite* went to defendant's residence, they had a search warrant. After knocking and receiving no answer, the police entered the home and found the defendant asleep in a bedroom of the home. The court upheld the arrest, making the following observation:

> "[T]he police entered [the defendant's] residence with a search warrant which affords the same justification for their entry into his residence as would an arrest warrant. (*Payton v. New York*.) [The defendant] was found in the house after a lawful entry. The officers had probable cause to believe that [the defendant] had committed a felony based on the information related to them [by an informant]; consequently, his arrest was lawful ***." *Kite*, 97 Ill. App. 3d at 827.

Defendant's next argument is with respect to the trial court's ruling on his pretrial motion to quash the search warrant. Defendant's written motion to quash the warrant alleged that Willis' affidavit made in connection with the search warrant contained "allegations that are false and misleading." Defendant also alleged that Willis had omitted "information," which if included in the affidavit would have prevented the issuing judge from find-

ing probable cause. Defendant argues that the trial court erred in denying defendant an evidentiary hearing on the motion.

At a suppression hearing on defendant's motion to quash arrest, Willis testified that the trace conducted on the license plate of the car observed by FBI Agent Evans at approximately 11:28 p.m. revealed that the owner was Rish and that her address, as turned up by the dispatch, was 920 South Greenwood, Kankakee. Paragraph 11 of Willis' affidavit reads:

> "11. and from the Illinois State Police Dispatch that the blue Buick is registered to [Rish], 756 Stratford Drive Eaast [*sic*], in the Village of Bourbonnais, and the white van is registered to [defendant], 1604 E. Eagle in the City of Kankakee."

Paragraph 12, however, explains why the warrant was requested for 756 Stratford Drive East rather than the Greenwood address revealed by the dispatch:

> "12. and has learned from Sheriff's Deputy Gary Mitchell that he knows both [defendant] and [Rish] and that both of them now reside at 756 Stratfrord [*sic*] Drive East in the Village of Bourbonnais, and that [defendant] is a white male and [Rish] is a white female."

In arguments before the trial court in support of their motions to quash the warrant, *Rish* argued that there was "a clear misstatement of fact regarding registration of motor vehicles" in paragraph 11 of Willis' affidavit. Not until after the trial court denied his motion to suppress did defendant argue that the affidavit contained certain omissions of "information" which defendant argued Willis "purposely concealed from [the issuing judge]." Defendant, however, never produced any evidence of the purported "omitted information" and in fact produced no evidence whatsoever in support of his motion to quash the warrant. Defendant simply *argued* that had Willis not omitted certain information from his

affidavit but instead acted in "good faith and *** been completely honest with the [issuing judge] *** the search warrant would never have issued." Upon questioning from the prosecutor regarding defendant's allegations, defendant conceded that Willis' intent was entirely "conjecture on [his] part" and did not dispute the prosecutor's argument that his allegations of Willis' misconduct were made without interviewing Willis.

The trial court denied the motions, stating:

> "I have reviewed the affidavit. I have reviewed again the motions for a hearing and I find that under *Franks v. Delaware* as set forth in *People v. Lucente* that the preliminary stage has not been properly reached."

The trial court also concluded that, even if the "misstatement *** [in paragraph 11] had not been in the affidavit" and whether the "information *** could or could not have been presented to the [issuing judge]," probable cause would still be found in the remaining information in the affidavit.

In *Franks v. Delaware* (1978), 438 U.S. 154, 57 L. Ed. 2d 667, 98 S. Ct. 2674, the Supreme Court held that under certain circumstances a defendant may be entitled to a hearing to challenge the veracity of sworn statements made by the police to obtain search warrants. The Court provided that the defendant must make a "substantial preliminary showing" that a false statement was knowingly or intentionally included in the affidavit or with reckless disregard for the truth *and* if the allegedly false statement is necessary for a finding of probable cause, a hearing is "require[d]." (*Franks*, 438 U.S. at 171, 57 L. Ed. 2d at 682, 98 S. Ct. at 2684; see also *People v. Lucente* (1987), 116 Ill. 2d 133, 147.) The challenger's allegations "must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations

must be accompanied by an offer of proof." *Franks*, 438 U.S. at 171, 57 L. Ed. 2d at 682, 98 S. Ct. at 2684; *Lucente*, 116 Ill. 2d at 147.

In the present case, based on its review of the affidavit, and the arguments made by defendant, the trial court concluded that defendant had failed to meet the threshold requirement of a "substantial preliminary showing." Our review of the record reveals that the trial court's decision was not against the manifest weight of the evidence. (*People v. Burbank* (1972), 53 Ill. 2d 261, 266.) Defendant's allegation that the affidavit contains false information in paragraph 11 is rebutted or at least explained on the face of the affidavit in paragraph 12. Further, defendant failed to provide any evidence in support of his allegations that Willis had intentionally omitted information from his affidavit, either in the form of the unexplained information itself or in the form of statements from Willis. See *Franks*, 438 U.S. at 171, 57 L. Ed. 2d at 682, 98 S. Ct. at 2684 ("Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained. Allegations of negligence or innocent mistake are insufficient").

Moreover, had defendant made the preliminary showing required under *Franks*, the trial court concluded that probable cause was still shown on the face of the affidavit in the remaining information. As we noted above, the trial court's ruling concluded that the affidavit supported a finding of probable cause even with the false information in paragraph 11 set aside and whether or not the omitted information defendant alluded to in his arguments was considered by the issuing judge. Our review of the affidavit under these circumstances leads us to the same conclusion. Defendant failed to show that the false information contained in paragraph 11 was "knowingly or intentionally" included in the affidavit or with "reck-

less disregard for the truth," requirements under the substantial preliminary showing language of *Franks*. Likewise, defendant fails to show Willis' intent in omitting "information" referred to but never demonstrated by defendant in his motion.

In addition to the statements in paragraph 11, for the first time defendant now challenges in this court the veracity of other statements in the affidavit. For the first time, defendant raises the issue of alterations to Willis' affidavit which may have been made after the warrant was issued and without the issuing judge's knowledge. In his post-trial motion for a new trial, defendant merely argued that "[t]he Court erred in denying defendant's Motion to Quash the Search Warrant and to Suppress Evidence Illegally seized." Defendant does not indicate how the trial court "erred" or otherwise provide a legal basis for his argument. We conclude that defendant has waived review of these claims (see, *e.g., People v. Enoch* (1988), 122 Ill. 2d 176; *People v. Hairston* (1970), 46 Ill. 2d 348, 367 ("Where the grounds for a new trial are stated in writing, the accused is limited on review to the errors alleged therein and all other errors are deemed to have been waived")) and that the plain error doctrine (134 Ill. 2d R. 615(a)) is inapplicable to this case (see, *e.g., People v. Carlson* (1980), 79 Ill. 2d 564).

Defendant's next argument concerns evidence discovered and removed from defendant's home during the execution of the search warrant. During the search of defendant's home, police officers seized a Kankakee telephone directory from a bedroom and a pair of boots from behind a wash machine and dryer in defendant's home. The victim's surname had been circled in the directory and soil on the boots was subsequently identified as coming from the site where Mr. Small was buried. Defendant argues that this evidence was improperly seized from his home and that the plain view exception

to the warrant requirement was erroneously applied to justify admission of this evidence at trial.

The plain view doctrine, an exception to the fourth amendment requirement, was established by the Supreme Court in its opinion in *Coolidge v. New Hampshire* (1971), 403 U.S. 443, 466, 29 L. Ed. 2d 564, 583, 91 S. Ct. 2022, 2038. The plain view doctrine entitles a police officer with prior justification for an intrusion to seize evidence that is in plain view. Where the police have a prior justification to search an area or a person, the doctrine acts as a supplement and allows the warrantless seizure beyond the original scope of the search. (*Coolidge v. New Hampshire* (1971), 403 U.S. 443, 466, 29 L. Ed. 2d 564, 583, 91 S. Ct. 2022, 2038; *People v. Stewart* (1984), 105 Ill. 2d 22, 52.) The doctrine does not permit a police officer to conduct wholesale unfettered searches; the doctrine's application is limited by the requirement that the object or objects seized be of an "apparently incriminating nature." *Stewart*, 105 Ill. 2d at 52.

In the instant case, the search warrant for defendant's home, attached garage, and two automobiles (Rish's automobile and defendant's van) authorized a seizure of the following items:

> "[P]erson of Stephen B. Small, clothing and personal belongings of Stephen B. Small, to include, Ebel watch, wallet, identification and credit cards, 1987 Mercedes automobile, Ill. registration NPS 30, tape recorder and tape recordings, handcuffs, car keys, glasses, maps, diagrams, notes."

With the exception of the victim and the 1987 Mercedes automobile, all of the items listed in the search warrant were relatively small and capable of being hidden or contained in another object. We believe it was reasonable for the police officer executing the warrant to have flipped through the pages of a telephone directory in

defendant's home in search of some of the items described in the warrant. (See *United States v. Pritchard* (7th Cir. 1984), 745 F.2d 1112, 1122 ("Certainly a search for small \*\*\* [items] justifies entry into containers in which they would fit and might reasonably be found").) Similarly, we believe that the police officer was acting within the scope of the authority conferred by the search warrant in searching behind the washer and dryer in defendant's home for some of the items described in the warrant.

When the police officer flipping through the directory saw the victim's name circled, the directory ceased to be merely a reasonable place in which defendant could have hidden some of the items listed in the warrant, such as maps or notes. It became an object of an "apparently incriminating nature," subject to seizure by the police pursuant to the plain view doctrine. The police knew that Mrs. Small had received a series of ransom calls and the discovery of a telephone directory with Small's telephone number plainly circled was clearly relevant as evidence of defendant's participation in the crime. The telephone directory, therefore, was properly seized at the time.

Likewise, police officers knew that the kidnapper had played a tape recording for Mrs. Small over the telephone on which the victim had stated that he had been placed in a box buried in the sand. The boots seized showed evidence of mud and sand and their seizure for forensic testing was also proper.

Defendant next argues that three pieces of evidence, specifically a gun, a cassette tape with recordings on it and a pair of boltcutters, were illegally obtained as a result of police misconduct. Defendant made a pretrial motion to suppress this evidence, which motion was denied. We find that the trial court's ruling on this motion was correct.

Defendant argued in his motion to suppress the evidence that on three separate occasions after his arraignment, Kankakee County Sheriff Bernie Thompson spoke with defendant in the absence of counsel. Defendant argues that as a result of Thompson's interviews, these three pieces of evidence were found in the Kankakee area. Defendant maintains that his conviction must be reversed in light of violations of his fifth and sixth amendment rights.

Defendant failed to object to the introduction of these items at trial and has accordingly failed to preserve the issues for review. (*People v. Enoch* (1988), 122 Ill. 2d 176, 186.) Moreover, the plain error doctrine (134 Ill. 2d R. 615(a)) is inapplicable to these issues because we find that the trial court did not err in admitting the evidence. However, because we find that the trial court did err in its legal conclusions regarding violations of defendant's constitutional rights, we will review the trial court's ruling on the defendant's pretrial motion to suppress this evidence.

The privilege against self-incrimination is guaranteed by the fifth amendment of the United States Constitution. In *Miranda v. Arizona,* the Supreme Court declared that an accused has a fifth and fourteenth amendment right to have counsel present during custodial interrogation. (*Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602.) The Court observed that the right to counsel does not exist by virtue of the accused's request for counsel; an accused's failure to request counsel therefore, does not waive the right. Rather, the Court held that an accused held for interrogation must be *informed* that he has the right to consult with a lawyer and to have a lawyer present during interrogation. *Miranda v. Arizona,* 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602.

In *Edwards v. Arizona,* the Supreme Court articulated the contours of a waiver of an accused's fifth amendment rights. The Court held that once an accused has expressed his desire to deal with the police only through counsel, he is not subject to further interrogation by the authorities until counsel has been made available to him, "unless the accused himself initiates further communication, exchanges, or conversations with the police." (*Edwards v. Arizona* (1981), 451 U.S. 477, 485, 68 L. Ed. 2d 378, 386, 101 S. Ct. 1880, 1885.) An accused may voluntarily waive his fifth amendment rights. The waiver must be shown to be knowing and intelligent as well as voluntary and cannot be established by showing merely that the accused responded to further police-initiated custodial interrogation, "even if he has been advised of his rights." *Edwards,* 451 U.S. at 484, 68 L. Ed. 2d at 386, 101 S. Ct. at 1885.

Recently, the Court considered the issue of whether *Edwards* protection ceases once the suspect has consulted with an attorney. (*Minnick v. Mississippi* (1990), 498 U.S. 146, 112 L. Ed. 2d 489, 111 S. Ct. 486.) The opinion held that "when counsel is requested, interrogation must cease, and officials may not reinitiate interrogation without counsel present, *whether or not the accused has consulted with his attorney.*" (Emphasis added.) (*Minnick,* 498 U.S. at 153, 112 L. Ed. 2d at 498, 111 S. Ct. at 491.) The *Minnick* opinion emphasized that *Edwards* does not foreclose finding a knowing or voluntary waiver of fifth amendment protections after counsel has been requested if there is evidence that the defendant initiates the conversations or discussions with the authorities. *Minnick,* 498 U.S. at 156, 112 L. Ed. 2d at 499, 111 S. Ct. at 492.

The sixth and fourteenth amendments guarantee the right to effective assistance of counsel. (*People v. Vriner* (1978), 74 Ill. 2d 329.) The right attaches only at or after

the time that adversary judicial proceedings have been initiated against him. *Kirby v. Illinois* (1972), 406 U.S. 682, 32 L. Ed. 2d 411, 92 S. Ct. 1877 (per Stewart, J., with Burger, C.J., and Blackmun and Rehnquist, JJ., concurring, and Powell, J., concurring in the result); *People v. Thompkins* (1988), 121 Ill. 2d 401.

The right to counsel may be waived. (See *Brewer v. Williams* (1977), 430 U.S. 387, 51 L. Ed. 2d 424, 97 S. Ct. 1232.) The appropriate standard to be applied to determine whether there is an effective waiver of counsel is whether there was " 'an intentional relinquishment or abandonment of a known right or privilege.' " (*Williams*, 430 U.S. at 404, 51 L. Ed. 2d at 439, 97 S. Ct. at 1242, quoting *Johnson v. Zerbst* (1938), 304 U.S. 458, 82 L. Ed. 1461, 58 S. Ct. 1019.) This standard applies equally to an alleged waiver of the right whether at trial or at a critical stage of pretrial proceedings. *Williams*, 430 U.S. at 404, 51 L. Ed. 2d at 440, 97 S. Ct. at 1242.

The trial court addressed each of the conversations defendant argues resulted in the discovery of evidence introduced at trial separately in its ruling on the motion and we will do the same.

During the period in which the conversations occurred, defendant was being held in the Kankakee County Correctional Center. The State concedes that defendant's fifth and sixth amendment rights had attached and been invoked on the dates each of the three conversations are alleged to have occurred. On September 28, defendant was removed from his cell and brought to an area on the third floor of the Correctional Center, described in the record as "an open cell type area in the hallway *** of the [Center]."

At the hearing on his motion, defendant testified that Thompson initiated a conversation with him on this date by asking him where a gun the police believed was used in the kidnapping could be found. According to defend-

ant's testimony, after a series of questions from Thompson about the location of the gun, he "eventually gave in and told [Thompson] where the gun was" hidden.

Thompson, on the other hand, testified that on September 25 he talked with defendant's brother, who told him that defendant wanted to see Thompson. Thompson also testified that a physician attending defendant after defendant attempted suicide told Thompson that defendant wanted to speak with Thompson. Thompson testified that he approached defendant on September 28 at defendant's request, relayed to Thompson by defendant's brother and a physician caring for defendant. Although Thompson testified that he had spoken to defendant's brother about the gun and his desire to locate it, Thompson emphasized throughout both his direct and cross-examination testimony that the purpose of his speaking to defendant was to inquire about his health, not to elicit information concerning the crimes with which defendant was charged. Thompson testified on direct examination as to the following conversation at this meeting with defendant:

"[Prosecutor]: Did you have a conversation with [defendant] at this time [September 28]?

[Thompson]: I did.

Q. What did the Defendant/Petitioner say to you in relation to the weapon which is the subject of this motion to suppress?

A. He stated that he had wanted to tell me where the weapon was a week prior, but that he was advised against it by his Attorney.

Q. Okay. Did you give him any admonitions at this time?

A. I told him that he should probably follow the advise [sic] of his Attorney.

Q. And what did he say to you?

* * *

A. He asked me how he could—he could relate that to me, where the location of the gun was."

Thompson told defendant that if he told him where the gun was hidden, he would attempt to recover it but that if he could not find it, he would bring defendant from the jail to show the police the location of the gun.

In its ruling, the trial court made the following statements with respect to the September 28 conversation:

"That on September 28, 1987 Mr. Edwards was represented by [counsel from the public defender's office]. *** [A]t this time, according to the Sheriff, [the physician caring for defendant] and one of the Defendant's brothers discussed with him his—the wellbeing of the Defendant and that the Sheriff took it upon himself to visit Mr. Edwards. And while he was there, he indicated from his testimony that he brought up the gun."

In a later clarification on its ruling, the court said:

"With the handgun there was a conversation. The conversation was between the Sheriff and the Defendant. The Sheriff initiated that conversation and did not contact the Defendant's lawyer. I am not sure whether there is a waiver or not a waiver at this point. I don't know. I can't tell from the testimony that was presented. I am saying that regardless of whether there was or there was not, this evidence is going to be admissible under *Nix v. Williams*."

In its ruling on the admissibility of the gun, the trial court concluded that Thompson initiated the September 28 conversation and that during the conversation, "[Thompson] indicated from his testimony that he brought up the gun." We are not persuaded that Thompson's testimony "indicated that he brought up the gun." In fact, Thompson specifically testified on redirect examination that defendant brought up the subject of the gun during the September 28 conversation:

"[Prosecutor]: Now, did you begin any conversation with Defendant on the day that you went to see him? The date of the 28th about the gun?

[Thompson]: Did I initiate it? No, sir."

However, despite the fact that we may have reached a different conclusion with regard to Thompson's testimony, we accept the trial court's ruling, as it is not manifestly erroneous. *People v. Tisler* (1984), 103 Ill. 2d 226, 248.

There is no question that in the present case defendant was in custody when the September 28 conversation occurred and it is uncontested that the gun was discussed and its location revealed. Accepting the trial court's finding that Thompson raised the subject of the gun, we are compelled to find that defendant was subjected to police-initiated interrogation at the September 28 conversation in violation of his fifth amendment rights. *Minnick*, 498 U.S. at 153, 112 L. Ed. 2d at 498, 111 S. Ct. at 491.

Moreover, we find that the trial court's ruling that defendant waived his right to have a lawyer present during this conversation is an incorrect legal conclusion. The court made the following statement:

"I am not saying that the Defendant did not knowingly waive his rights to have a lawyer present because *I am satisfied that he did.* \*\*\* [T]he Defendant did have a right to say no and he knew that he had a right to say no." (Emphasis added.)

In *Michigan v. Jackson* (1986), 475 U.S. 625, 89 L. Ed. 2d 631, 106 S. Ct. 1404, the Supreme Court held that the *Edwards* rule applies " 'by analogy' " to a defendant who has been charged with a crime at an arraignment and who has requested appointment of counsel. There the court held the following:

"We thus hold that, if police initiate interrogation after a defendant's assertion, at an arraignment or similar pro-

ceeding, of his right to counsel, any waiver of the defendant's right to counsel for that police-initiated interrogation is invalid." (*Jackson*, 475 U.S. at 636, 89 L. Ed. 2d at 642, 106 S. Ct. at 1411.)

In the present case, it is conceded by the prosecution that defendant had invoked his right to counsel at his arraignment and thus his sixth amendment rights had attached at the time of the September 28 conversation. Therefore, Thompson's interrogation was in violation of defendant's sixth as well as his fifth amendment rights.

In summary, therefore, we find that defendant's statements to Thompson during the September 28 conversation were coerced in violation of his fifth and sixth amendment rights. Accordingly the evidence obtained as a result of these constitutional violations, namely the gun, should have been excluded from defendant's trial unless the prosecution was unable to demonstrate to the court that the gun either would have been "inevitably discovered" in the police's search of the area surrounding the burial site, or that the gun was discovered by an independent, legitimate source, separate from the taint of the police misconduct. The trial court ruled that the gun was admissible in light of the Supreme Court's conclusion under *Nix v. Williams* (1984), 467 U.S. 431, 81 L. Ed. 2d 377, 104 S. Ct. 2501.

In *Nix v. Williams*, the Court held that evidence obtained in violation of an accused's constitutional rights and which otherwise would be inadmissible at trial may be admitted if the prosecution is able to show that the evidence "would inevitably have been discovered without reference to the police error or misconduct." (*Nix*, 467 U.S. at 448, 81 L. Ed. 2d at 390, 104 S. Ct. at 2511.) In *Nix*, the defendant was arrested in connection with the disappearance of a child. Defendant argued that he was interrogated in violation of his sixth amendment right, and in response to this police-initiated interrogation he

led police to the discovery of the child's body. The police officer who initiated the interrogation of the defendant was one of the members of the search party the defendant guided to the child's body. (*Nix*, 467 U.S. at 437, 81 L. Ed. 2d at 383, 104 S. Ct. at 2505-06.) Defendant argued that the body's location was the "fruit" of an interrogation by the police that was conducted in violation of the defendant's sixth amendment right. The defendant argued that the evidence recovered as a result of the interrogation must be suppressed. An official testifying for the prosecution at a suppression hearing on defendant's motion testified that groups of volunteers searched "specific grid areas" and that the child's body, which the defendant led the police to, would inevitably have been discovered if the search had continued for another three to five hours. (*Nix*, 467 U.S. at 449, 81 L. Ed. 2d at 390-91, 104 S. Ct. at 2511.) The Court, adopting the "inevitable discovery" exception to the exclusionary rule, concluded that the body "inevitably would have been found" (*Nix*, 467 U.S. at 450 & n.7, 81 L. Ed. 2d at 391 & n.7, 104 S. Ct. at 2512 & n.7), and therefore the evidence was admissible despite the police misconduct.

The "inevitable discovery doctrine" was developed as an exception to the exclusionary rule, which requires exclusion from use at a criminal trial illegally obtained evidence. Although the rule has its genesis in cases involving fourth amendment violations (see *Silverthorne Lumber Co. v. United States* (1920), 251 U.S. 385, 64 L. Ed. 319, 40 S. Ct. 182; *Wong Sun v. United States* (1963), 371 U.S. 471, 9 L. Ed. 2d 441, 83 S. Ct. 407), the Court has extended the rule to cases involving sixth and fifth amendment violations (see *Nix*, 467 U.S. at 442 n.3, 81 L. Ed. 2d at 386 n.3, 104 S. Ct. at 2508 n.3 (and cases cited therein)).

In those cases involving a violation of the fifth amendment, namely *Murphy v. Waterfront Comm'n of*

*New York Harbor* (1964), 378 U.S. 52, 79, 12 L. Ed. 2d 678, 695, 84 S. Ct. 1594, 1609, and *Kastigar v. United States* (1972), 406 U.S. 441, 460-61, 32 L. Ed. 2d 212, 226, 92 S. Ct. 1653, 1665, the Court analyzed the constitutional violation under the "independent source doctrine," a doctrine closely related to the inevitable discovery doctrine. Pursuant to the independent source doctrine, the prosecution must show that the evidence obtained through police misconduct "had an independent, legitimate source" before its use will be allowed at trial. *Murphy*, 378 U.S. at 79 n.18, 12 L. Ed. 2d at 695 n.18, 84 S. Ct. at 1609 n.18. See also *Kastigar*, 406 U.S. at 460, 32 L. Ed. 2d at 226, 92 S. Ct. at 1665.

Both the independent source doctrine and the inevitable discovery doctrine are exceptions to the exclusionary rule, allowing evidence which is " 'in some sense the product of illegal governmental activity' " in at trial. Because we believe the inevitable discovery doctrine justified admission of the gun into evidence, we affirm the trial court's ruling on this issue.

Testimony was received at the hearing on defendant's motion to suppress on the search for evidence that was conducted after the discovery of Mr. Small's body on September 4. Anderson was the evidence officer in charge of the ground search parties and Willis oversaw the entire operation, coordinating efforts among the Kankakee and State police as well as the FBI agents involved in the investigation. Both men frequently accompanied some of the search parties on their routes.

Testimony revealed that discovery of Mr. Small's body prompted a general search of the burial site that night and a more comprehensive "grid search" of rural Kankakee County between Aroma Park and the burial site in the weeks following the discovery of the body. "Every road in that area was systematically searched" by approximately 24 officers working in three to four

search parties. There was no testimony at the hearing pinpointing the date the search parties began their activities, although Willis testified that to the best of his recollection, the searches were conducted "between September 6 and the 28th." Willis testified that at least one search party was sent out everyday and for approximately 10 days two search parties were sent out everyday.

Rish had given the police information regarding evidence used in the crimes and where defendant had disposed of this evidence. She led the police to the burial site using routes defendant had taken the day of Mr. Small's kidnapping and the days following up until defendant's arrest. The search parties concentrated their activities on these routes and surrounding locations as well as additional areas they believed evidence might be discovered, including the telephone booths from where the ransom calls were placed. Willis testified that based on Rish's statements, he had an idea where the evidence would be found and that is how the searches were patterned.

The gun was found on September 28 lying next to a telephone pole on County Road in Kankakee. Thompson testified that "after receiving the information" from defendant, he asked Chief Nugent to accompany him in a search for the gun. After recovering the gun, Thompson called Anderson on his radio and asked him to come to County Road and collect the gun. Anderson testified that after receiving the call from Thompson and Nugent, he went to County Road, photographed the gun and removed it using evidence bags.

Although the gun was recovered by Thompson as a result of the information defendant gave him during the September 28 conversation, we believe the testimony elicited at the hearing supports the conclusion that it was found "essentially within the area" (*Nix*, 467 U.S.

at 436, 81 L. Ed. 2d at 383, 104 S. Ct. at 25) the police had planned to search. We believe the trial court's ruling on defendant's motion with respect to the gun was not against the manifest weight of the evidence.

The trial court also ruled that the cassette tape (the "road tape") was admissible at trial. The testimonies of defendant and Thompson with regard to any conversation the two had regarding the road tape were conflicting. Defendant testified that on September 9, Thompson initiated a conversation with him, which also took place on the third floor of the Correctional Center away from defendant's cell. Defendant testified that Thompson first asked him about his health and that later in the conversation Thompson asked him if there was any information defendant wanted to tell Thompson regarding tape recordings of Mr. Small that defendant had made at the site he was buried. Defendant testified that he told Thompson that the tape could be found near the intersection of two roads in rural Kankakee. He also testified that when he spoke to Thompson on September 9 he knew that he was represented by a lawyer.

Thompson recalled having a conversation with defendant about the road tape, but he testified that he did not talk to defendant on September 9. Thompson testified that he approached defendant on September 10, 11 or 12 at defendant's request, which was relayed to Thompson by Chief Lockwood, an official with the Kankakee police force. Thompson testified on cross-examination as to the substance of that conversation:

> "[Thompson]: Chief Lockwood had advised me that [defendant] wanted to talk to me. That [defendant] had felt bad because of his attempted suicide and wanted to reassure me that it would not take place again.
>
> [Defense]: And did you, in fact, talk to him about that?
>
> A. Yes, sir, I did.

* * *

Q. All right, and in addition to the suicide, did you talk to [defendant] about anything else?

A. On that date?

Q. Yes.

A. Not to my recollection."

Thompson also testified on cross-examination that he recalled talking to defendant about the road tape on September 28, during which he told defendant that "a tape had been recovered and it was being submitted for examination."

The trial court made the following observation in its ruling on the motion to suppress the road tape:

"Insofar as the tapes were concerned, the court is forced to accept the testimony of the Sheriff or the testimony of the Defendant. *** It seems that the Sheriff denies the conversation with the Defendant about the tapes. The Defendant says he talked about the tapes. I don't know whether there was a discussion about the tapes or not. I got the impression that if there was a conversation about the tapes that it was not transferred. The Command Center didn't know about it anyway, and found the items on their own in their extensive search which was being conducted in the area bounded by whatever highways are. *** I have no doubt that given the intensity of the search that these items would have been discovered."

In its ruling on the admissibility of the road tape, the trial court expressed uncertainty as to whether a conversation concerning the whereabouts of the road tape ever in fact took place. The testimony from the witnesses was contradictory, with the defendant testifying that the conversation took place on September 9 and Thompson testifying that he did not speak to defendant on that date. Thompson testified that he spoke to defendant about the road tape, but only to tell him that a tape had been recovered, and that the conversation occurred on September 28. If the conversation did occur on September 9 as

defendant argues, there is no evidence as to who initiated the conversation (*Minnick*, 498 U.S. at 153, 112 L. Ed. 2d at 498, 111 S. Ct. at 491). The trial court made no ruling as to whether defendant's fifth and sixth amendment rights were violated, and in light of the conflicting testimony in the record, we are unable to determine whether defendant was interrogated in violation of his fifth and sixth amendment rights.

Nonetheless, as we have observed in our ruling above, regardless of whether there was a constitutional violation, the road tape was admissible at trial if the prosecution was able to demonstrate that its discovery was either "inevitable" or pursuant to an "independent source," as these terms are discussed in *Nix v. Williams*. The trial court concluded that the road tape was admissible and our review of the record leads us to conclude that the evidence at the hearing supported this conclusion.

The tape was found on September 10 by a foot search party on the side of the road in rural Kankakee. Anderson testified that he was not present when the tape was first discovered although he did arrive at the location before the tape was removed. He testified that the tape was "strung out over hundreds and hundreds of feet" next to the road, entangled in the weeds. Anderson's testimony on cross-examination contained the following exchange:

"[Defendant]: Had you had any conversations with Sheriff Thompson prior to the introduction of this systematic search throughout the County?

[Anderson]: No, sir.

Q. To your knowledge had any police officers in the investigation had any contact with Sheriff—Sheriff Thompson?

A. Not to my knowledge."

Willis testified similarly, stating that he had never spoken to Thompson about the status of the search or the areas of Kankakee that had been covered in the search for the road tape. He testified that he had a discussion about the road tape with another member of the Kankakee police force assigned to the search, but that the discussion took place after the tape had been found. In light of this testimony, we are persuaded that the road tape was recovered independently of any conversation Thompson may have had with defendant.

Finally, defendant argues that at an October 7 conversation with Thompson, he told the sheriff where a pair of boltcutters used in the kidnapping could be found. The conversation took place in a "holding room" on the first floor of the Correctional Center. Defendant testified that during the October 7 conversation Thompson asked him what he had used to cut the handcuffs found on Mr. Small's wrists. In the ensuing conversation, defendant testified that he told Thompson that the boltcutters could be found "very close where the box was at." Thompson testified that this conversation never took place and that the only time he spoke with defendant in October was on October 23 at defendant's request.

The only testimony regarding the recovery of the boltcutters was received from Willis. He testified on direct examination that the boltcutters were found by Anderson on October 7 about 100 paces from the burial site. The boltcutters were approximately 36 inches long and painted orange and blue. Willis testified that the area where the boltcutters were recovered had been searched previously but the search parties returned to the area to find evidence that was still missing: "We were looking for boltcutters, car keys, credit cards, Mr. Small's wallet." Willis testified that the composition of

the soil in the area the boltcutters were found is "loose sand" which was easily disturbed by natural forces and people. There was also heavy foliage covering the land. Willis testified that the site could be aptly described as a "jungle." The boltcutters were found "back in brush, into a heavy heavy cover. It wasn't on a pathway or anything like that. It was back." In response to a question from the court, Willis testified as follows:

> "[Court]: It was not like the cutters were missed. Like somebody had looked there and missed the cutters in the same location?
>
> [Willis]: On that particular area nothing had been found right where the boltcutters had been."

The trial court concluded that "the boltcutters were independently found according to Officer Willis' testimony" without considering defendant's fifth and sixth amendment claims.

Reviewing the record, we again find that the testimony at the hearing was conflicting as to whether the conversation occurred and, if so, who initiated a discussion of the boltcutters. Defendant testified that the conversation took place and the subject of the boltcutters was raised at Thompson's initiation, and Thompson testified that he never spoke to defendant on October 7. Based on this evidence alone, we are unable to determine whether defendant was interrogated in violation of his fifth and sixth amendment rights. However, in light of Willis' testimony at the hearing, we conclude that there was sufficient evidence presented at the hearing to support the trial court's conclusion that the boltcutters' admission at trial was permitted in light of the independent source for their discovery.

Defendant next argues that the prosecution improperly exercised peremptory challenges to exclude four black prospective jurors from his petit jury in violation of both the equal protection clause of the fourteenth

amendment and the fair-cross-section requirement of the sixth amendment. After the jury had been impanelled, defendant made a motion to dismiss the jury because the prosecutor had "systematically excluded black people from [the] jury." After hearing brief arguments on the motion, the trial court denied the motion.

In *Batson v. Kentucky* (1986), 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712, the Supreme Court held that prosecutors who disqualify potential jurors based on their race violate the fourteenth amendment's guarantee of equal protection. The defendant in *Batson* was a black man who challenged the prosecutor's use of peremptory challenges to exclude black prospective jurors from the venire. The Court stated that a defendant challenging the exclusion of prospective jurors on the basis of race must show "that members of his race have been impermissibly excluded." This court subsequently held that a white defendant does not have standing to assert a *Batson* claim relating to peremptory challenges of black jurors. *People v. Holland* (1987), 121 Ill. 2d 136, *aff'd* (1990), 493 U.S. 474, 107 L. Ed. 2d 905, 110 S. Ct. 803.

Recently, in *Powers v. Ohio* (1991), 499 U.S. ___, 113 L. Ed. 2d 411, 111 S. Ct. 1364, the Court said regardless of the race of the defendant, it is unlawful to exclude jurors because of their race: "[A] criminal defendant may object to race-based exclusions of jurors effected through peremptory challenges whether or not the defendant and the excluded juror share the same race." *Powers*, 499 U.S. at ___, 113 L. Ed. 2d at 419, 111 S. Ct. at 1366.

In order to prevail on his claim of unconstitutional discrimination in the exercise of peremptory challenges, a defendant is required to establish a *prima facie* case of discrimination. (*Batson*, 476 U.S. at 96, 90 L. Ed. 2d at 87, 106 S. Ct. at 1723; *People v. Evans* (1988), 125 Ill. 2d 50, 63.) Under *Batson*, a defendant was required to

"first show that he was a member of a cognizable racial group" and that the prosecutor exercised peremptory challenges to remove from the venire members of that racial group. Second, the defendant was entitled to rely on the fact that peremptory challenges constitute a jury-selection practice that permits those to discriminate who are of a mind to discriminate. Finally, the defendant was required to show that these facts and " 'any other relevant circumstances' " raise an inference that the prosecutor peremptorily challenged venire members on account of their race. *Evans*, 125 Ill. 2d at 63.

We believe, in light of the opinion in *Powers*, that in order for a defendant to establish a *prima facie* case of discrimination, he need not show that he is a member of "a cognizable racial group" but must otherwise still show the other requirements established in *Batson*. We base our conclusion on the fact that the *Powers* opinion was consistent with the Court's opinion in *Batson* and in fact simply extended the precepts of *Batson* to all defendants, regardless of race.

> "The emphasis in *Batson* on racial identity between the defendant and the excused prospective juror is not inconsistent with our holding today that race is irrelevant to a defendant's standing to object to the discriminatory use of peremptory challenges. Racial identity between the defendant and the excused person might in some cases be the explanation for the prosecution's adoption of the forbidden stereotype, and if the alleged race bias takes this form, it may provide one of the easier cases to establish both a *prima facie* case and a conclusive showing that wrongful discrimination has occurred. But to say that the race of the defendant may be relevant to discerning bias in some cases does not mean that it will be a factor in others, for race prejudice stems from various causes and may manifest itself in different forms." (*Powers*, 499 U.S. at ___, 113 L. Ed. 2d at 429, 111 S. Ct. at 1373-74.)

Accordingly, in order for defendant herein to prevail on his fourteenth amendment claim, he must demonstrate the "relevant circumstances" that raise an inference that the prosecutor peremptorily challenged venire members on account of their race.

This court has on prior occasions considered those circumstances deemed relevant in establishing a *prima facie* case of discrimination. These include:

> "[A] 'pattern' of strikes against black jurors; 'the prosecutor's questions and statements during *voir dire* examination and in exercising his challenges' [citations]; the disproportionate use of peremptory challenges against blacks [citations]; the level of black representation in the venire as compared to the jury [citations]; whether the excluded blacks were a heterogeneous group sharing race as their only common characteristic [citation]; the race of the defendant and victim [citations]; and the race of the witnesses [citations]. Simply because black veniremen are peremptorily challenged does not, without more, raise the specter or inference of discrimination. *Batson*, 476 U.S. at 101, 90 L. Ed. 2d at 91, 106 S. Ct. at 1725 (White, J., concurring) (it is not unconstitutional, without more, to strike one or more blacks from the jury); *People v. Hooper* (1987), 118 Ill. 2d 244, 247-49 (Ryan, J., specially concurring) (the court must avoid arbitrarily deciding this delicate question solely from the number of blacks peremptorily challenged); *Phillips v. State* (Ind. 1986), 496 N.E.2d 87, 89 (use of peremptory challenges against black jurors does not, by itself, raise an inference of racial discrimination)." *Evans*, 125 Ill. 2d at 63-64.

In the present case, the trial court, not the prosecutor, conducted the *voir dire*, and defendant did not argue at trial, nor does he now on appeal, that the prosecutor's statements in exercising the peremptory challenges were discriminatory. See *Evans*, 125 Ill. 2d at 65.

The record does not indicate that the prosecutor used a disproportionate number of peremptory challenges to exclude blacks from the jury. The prosecutor used only 4 of his 14 peremptory challenges to exclude venire members who were black and used the remaining 10 to exclude white venire members. See *Evans*, 125 Ill. 2d at 65.

Moreover, the present case, unlike *Batson*, did not involve an interracial crime in which one racial group may be likely to take sides of prejudice against another racial group. (See *Evans*, 125 Ill. 2d at 65-66.) In the present case, both the victim and the defendant were white. The record does not reveal the race of all the witnesses at trial, but for those it does, they too were white. Both *Batson* and pre-*Batson* opinions recognize the significance of the racial characteristics of a crime in determining whether a *prima facie* case of discrimination has been established. See *Evans*, 125 Ill. 2d at 66 (and accompanying citations).

We recognize that the excluded black venire members did not share any identifiable characteristics other than race and that the level of black representation in the venire (approximately 10%) was higher than that in the jury (no blacks). However, we do not find that defendant has established a *prima facie* case of discrimination on these circumstances alone. Moreover, even if this court were to conclude that defendant established a *prima facie* case of discrimination, and we emphasize that he has not, we find that the prosecutor gave race-neutral reasons for excluding the black venire members when arguments were heard on defendant's motion. Therefore, we affirm the trial court's ruling denying defendant's motion to dismiss the jury. See *Evans*, 125 Ill. 2d at 67 (citing *People v. Conner* (1979), 78 Ill. 2d 525, 532).

Defendant also argues that his rights under the sixth amendment were violated by the exclusion of certain

black jurors from his petit jury. In *Holland*, 121 Ill. 2d 136, *aff'd* (1990), 493 U.S. 474, 107 L. Ed. 2d 905, 110 S. Ct. 803, this court also held that that the sixth amendment's fair-cross-section safeguards apply only to the venire and not to the jury itself. We find, therefore, that this court's decision in *Holland* forecloses defendant's fair-cross-section claim.

Defendant's next argument is that two prospective jurors were improperly excluded for cause based upon their opposition to the death penalty. In *Witherspoon v. Illinois* (1968), 391 U.S. 510, 522, 20 L. Ed. 2d 776, 784-85, 88 S. Ct. 1770, 1777, the Supreme Court held that no venire members shall be excused for cause "simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." A juror may be opposed to the death penalty in theory, but if he indicates that he is willing to temporarily set aside his beliefs in deference to the rule of law, he is not subject to removal for cause. (*Lockhart v. McCree* (1986), 476 U.S. 162, 176, 90 L. Ed. 2d 137, 149, 106 S. Ct. 1758, 1766.) The apt question is "whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " *Wainwright v. Witt* (1985), 469 U.S. 412, 424, 83 L. Ed. 2d 841, 851-52, 105 S. Ct. 844, 852.

Prior to being questioned by the prosecutor and defendant, the trial court conducted its own *voir dire* of the prospective jurors ("Juror A" and "Juror B"). The court questioned Juror A on his views regarding the death penalty and the entire text of that portion of the *voir dire* follows:

"Q. In this particular case [Juror A] the State is asking the jury to consider the option of the death penalty, do you understand that? However, the first job of the jury will be to listen to the evidence and decide from that

evidence if the State has proven the defendant guilty be-
yond a reasonable doubt of the crime itself. Do you un-
derstand that?

A. Yes.

Q. Would the question of the death penalty influence
you in deciding whether the person is guilty or not
guilty?

A. No.

Q. Are you for any reason, whether it is moral, ethi-
cal, religious, or political opposed to the death penalty?

A. Yes I am.

Q. Can you tell me the nature of the opposition?

A. Morally, I am morally opposed to it.

Q. All right. Do you understand that in Illinois only
certain types of murders qualify for the option of giving
the death penalty?

A. Yes.

Q. Is your opposition to the death penalty such that
you would automatically vote against the death penalty
for this defendant regardless of the facts of the case?

A. Yes I believe so, I am against it.

Q. You are just flat out against it.

A. Yes.

Q. All right."

At the conclusion of the court's *voir dire*, the State
moved for removal for cause in light of Juror A's posi-
tion on the death penalty. Defendant objected and re-
quested leave to conduct his own *voir dire* of Juror A.
The court granted defendant's request, at which point
the State and defendant conducted separate *voir dires*
of Juror A.

We find no ambiguity in Juror A's responses to the
court's questions on the effect his views on the death
penalty would have on fulfilling his duties as a juror. In
the words of the court, he is "just flat out against it."
The subsequent exchange between Juror A and the pros-
ecutor and defendant was at the request of defendant.
Any further questions put to Juror A were invited by

defendant in his attempt to clarify what appears to us to be an unambiguous opposition to the death penalty "regardless of the facts of the case." Based on our review of the record, Juror A's responses to the State's and defendant's *voir dires* indicated his inability to fulfill his duties as a juror in light of his position on the death penalty. An example of the State's *voir dire* follows:

> "[Prosecutor]: *** But the question I have to know is if the law, or if the evidence shows he would be sentenced to death, can you sign the verdict that says he *** will be sentenced to death?
>
> A. No, I don't believe so.
>
> * * *
>
> [Court]: [Juror A] is that a no or a no I don't believe so?
>
> A. It is a no."

We are satisfied, based on Juror A's unambiguous responses to the court's and the State's and defendant's *voir dires* that Juror A was removed for cause.

Defendant argues that Juror B was improperly removed for cause based on her response to the prosecutor's question asking if she could "sentence the defendant Daniel Edwards to death." Defendant maintains that although Juror B expressed opposition to the death penalty, she indicated a willingness to set aside her beliefs in compliance with her duties if she was chosen as a juror in the trial. Defendant argues that it was not until Juror B was posed with what defendant maintains were improper questions in light of the Court's opinion in *Witherspoon*, 391 U.S. at 522 n.21, 20 L. Ed. 2d at 785 n.21, 88 S. Ct. at 1777 n.21, that she was excused for cause.

The following exchanges took place during the *voir dire* of Juror B:

"[Prosecutor]: *** It is just that I need to know as a representative of the prosecution and the State whether or not you can decide to sentence somebody to death.

A. See I, I, I, I don't—probably not.

Q. Okay, there is nothing wrong with your probably not—what do you mean by probably not—it is not a question of whether you want to serve on this jury because I understand it would be a hardship for you to serve on this jury, but the question is can you give the State a fair trial and consider the death penalty knowing that you might have to sign your name to sentence the defendant Daniel Edwards to death.

A. I better say no, just flat no.

* * *

[Defense]: *** [A]re you saying that under no circumstance regardless of what the evidence is you couldn't give a death penalty, or are you just saying I don't know?

A. I could probably—hearing all the evidence I could probably say guilty or not guilty, but as far as telling him that he has to be put to, had to be—what is it?

[Prosecutor]: Executed.

[Defense]: Put to death.

A. Put to death—I don't think I could do it."

Defendant objects to the prosecutor's refinement of Juror B's general opposition to the death penalty to the effect that opposition would have on her judgment in the instant case. This line of questioning, defendant argues, was "condemned" by the Court in *Witherspoon*, where the Court, in a footnote to the opinion, indicated that a "prospective juror cannot be expected to say in advance of trial whether he would in fact vote for the extreme penalty in the case before him." (*Witherspoon*, 391 U.S. at 522 n.21, 20 L. Ed. 2d at 785 n.21, 88 S. Ct. at 1777 n.21.) In our opinion, this footnote indicates nothing more than that which common sense dictates, that a prospective juror cannot reasonably be "expected" to indicate whether he would vote to impose the death penalty in a case in which he has heard no evidence. We are un-

persuaded by defendant's arguments that Juror B was "coerced *** into making a pretrial statement" regarding the death penalty as a result of the prosecutor's questions. We are satisfied that Juror B's answers indicated an inability to fulfill her duties as a juror in light of her position on the death penalty and her removal for cause was proper.

Defendant's next argument is with respect to the trial court's ruling on the State's pretrial motion *in limine* to preclude testimony concerning statements made by defendant prior to trial. In its written motion, the State does not include the statements themselves. Rather, the State refers to the statements by the time and date they were made and the individual to whom the statements were made.

The State also requested the trial court to exclude certain nonverbal acts performed by defendant, including:

> "(1) The act of leading the police to the place where he buried Stephen Small;
>
> (2) Any actions made at the scene of the recovery of Stephen Small's body; and,
>
> (3) The act of leading the police to the location where he hid the gun he used in kidnapping Stephen Small and forcing him into the box."

The State sought to have the statements suppressed on the theory that either they were hearsay statements, inadmissible under any of the exceptions to the hearsay rule, or they were prior consistent statements which defendant could not introduce in his opening statement. The trial court granted the State's motion with respect to the oral statements, but allowed defendant to "argue [the acts] in opening statement *** and [introduce] them in by testimony." The trial court did not indicate the basis for its ruling.

In this court, defendant argues that the trial court's ruling on the State's motion was erroneous. Defendant argues that "several" of the statements suppressed by the ruling either were not hearsay or fell within an exception to the hearsay rule. With the exception of three statements, defendant fails to indicate what statements were erroneously suppressed. Without knowing the substance of the statements defendant argues are not hearsay, this court is unable to assess the merits of defendant's argument. We will therefore consider only those statements defendant discusses in his brief.

After defendant was arrested and held in the Kankakee County Detention Center, he spoke with an attorney. At approximately 8:47 p.m., defendant saw police officers arrive at the Detention Center with Rish and begin booking her. Defendant then said, in the presence of two FBI agents at the Detention Center, that he wanted to talk to the Kankakee State's Attorney and a lawyer in order to "make a deal." Officers were unable to reach his lawyer by telephone. Defendant then said something to the effect, "f*** my lawyer, we don't have time."

At approximately 10 p.m., defendant rode with officers to the grave site. One of the officers removed Mr. Small's body from the grave and noted that *rigor mortis* had set in. Defendant asked the officers to define or explain the term to him and after receiving the explanation, defendant fell to the ground on his knees and exclaimed, "Oh, no, oh, no, he can't be dead." After Mr. Small's body had been disinterred, defendant was placed in the back seat of a squad car, at which point he asked for police protection for his former wife and children, who lived in Washington.

Because the trial court did not articulate the basis for its ruling, we must examine the propriety of the ruling under all the possible theories upon which it could have been based.

The trial court may have based its ruling on the finding that all of the statements which were the subject of the motion were hearsay which did not meet any of the recognized exceptions. However, even if this conclusion were incorrect and the statements were not in fact hearsay or fell under one of the recognized exceptions, the statements would not be admissible unless defendant were able to demonstrate their probative value as evidence.

"Hearsay is an extrajudicial statement offered in court 'to show the truth of the matters asserted.' " (*People v. Anderson* (1986), 113 Ill. 2d 1, 11-12, quoting *People v. Carpenter* (1963), 28 Ill. 2d 116, 121.) The value of hearsay evidence rests "upon the credibility of the out-of-court asserter." (*Carpenter*, 28 Ill. 2d at 121.) This court has held that self-serving statements or conversations between a defendant and third parties subsequent to the commission of the crime are not competent evidence. (See, *e.g., People v. Kosearas* (1951), 410 Ill. 456; *People v. Jones* (1962), 26 Ill. 2d 300, 305.) The rationale underlying this exclusion is that the credibility of the defendant is suspect and his statements are not reliable in light of the defendant's motive to fabricate testimony favorable to his innocence. See *People v. Lewis* (1979), 75 Ill. App. 3d 259, 284.

Defendant attempts to demonstrate that the "make a deal," "f*** my lawyer, we don't have time" and the "oh, no, oh, no, he can't be dead" statements either are nonhearsay statements or fall under one of the recognized exceptions to the rule. For instance, defendant argues that the statement made when Mr. Small's body was removed from the grave was a nonhearsay "reaction" rather than a testimonial "assertion." (See, *e.g., People v. Orr* (1986), 149 Ill. App. 3d 348.) Defendant argues that the "oh, no, oh, no, he can't be dead" statement was not offered for the truth of the matter as-

serted, but should have been admitted as a "mere reaction." We do not believe, however, that this statement has any evidentiary value as a verbal act. Rather, we conclude that the significance of the statement lies in its substantive content and not simply in the fact that it was made. See generally 6 J. Wigmore, Evidence §250 (Chadbourn rev. ed. 1979).

Defendant also argues that the three statements "were crucial to [his] defense." Defendant argues that these statements "[were] relevant to show that [he] had not acted intentionally or knowingly *** [t]he various statements that not much time was left tended to show that [he] believed that [Mr.] Small was alive and therefore that [he] had not intended to kill him or knew that he would die."

We are wholly unpersuaded by defendant's argument. Whether defendant in fact *believed* Mr. Small was alive is irrelevant; among the numerous crimes he was charged with was felony murder, a non-specific-intent crime. In order to admit statements which indicate declarant's state of mind, "the declarant's state of mind must be relevant to a material issue in the case." (*People v. Floyd* (1984), 103 Ill. 2d 541, 546.) These statements, which defendant now argues were improperly suppressed from trial and are "relevant *** indeed crucial" to his defense, are alone convincing evidence to this court that defendant "knowingly asphyxiated and killed" Mr. Small. Defendant's statement that there was "not much time left" seems to indicate to this court defendant's knowledge that there was "not much time left" *before Mr. Small would suffocate.*

We therefore reject as meritless this and defendant's other arguments attempting to show that these three statements should be considered as exceptions to the hearsay rule. We affirm the trial court's ruling on this motion. We decline to consider the alternative basis on

which the trial court could have based its ruling excluding the statements, that is, that the statements are inadmissible as prior inconsistent statements, in light of our conclusion that they are inadmissible hearsay.

A number of tape recordings were admitted in evidence at trial. As noted above, Mrs. Small received ransom calls from the kidnapper at 3:30 a.m., 5:03 p.m., 11:28 p.m. and 11:46 p.m. Two of these telephone calls, the 5:03 and the 11:28 calls, were recorded by a recording device placed on the Small household telephone and the tapes of these conversations were played at trial (the "house tapes"). During the 3:30 a.m., 5:03 p.m. and the 11:28 p.m. ransom calls, the kidnapper played tape recordings of Mr. Small's voice giving instructions to his wife; this tape of Mr. Small's voice, referred to above as the "road tape," was recovered on the roadside during a police search of rural Kankakee. Jean Small also received a telephone call from the kidnapper on September 2 at approximately 5:40 p.m. Immediately following the conversation, she telephoned the Small home, which conversation was recorded (the "Jean Small tape"). The tape of the conversation between Jean Small and Mrs. Small's brother-in-law was also played at trial.

Defendant makes a number of challenges with respect to the house, road and Jean Small tapes. Defendant first challenges the emergency use of an eavesdropping device on the victim's home telephone which led to the creation of the house and Jean Small tapes. He argues that judicial approval of the emergency recording procedures was not obtained within the time required by the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1987, ch. 38, par. 108A—1 et seq.) (Code) and that the trial court failed to make written findings authorizing the eavesdropping devices in accordance with the Code. We find that defendant has waived review of this claim.

Article 108A of the Code contains the provisions of the eavesdropping statute (Ill. Rev. Stat. 1987, ch. 38, par. 108A—1 *et seq.*). The statute provides that any challenge to the evidence obtained from electronic surveillance must be made in an appropriate pretrial motion. (Ill. Rev. Stat. 1987, ch. 38, par. 108A—9(b).) Defendant filed a motion *in limine* with the trial court in which he sought to have the State prohibited from playing at trial the recordings made from the traps placed on Mr. Small's home telephones. Defendant provided a number of different challenges to the propriety or the legality of the recordings, but none of these challenges was based on a violation of the eavesdropping statute. As the State argues in its brief to this court, this omission amounts to defendant's waiver of review of this claim. See, *e.g.,* *People v. Garcia* (1983), 97 Ill. 2d 58, 86; *People v. Curry* (1973), 56 Ill. 2d 162, 170.

Defendant's next challenge is to the admission of the house and the road tapes at trial. In this court, defendant challenges the State's use of the "tape recordings" as evidence of defendant's intent to murder Mr. Small. He argues that there was a "lack of foundation" upon which the "tape recordings" could be used as evidence of defendant's intent.

In a pretrial motion *in limine,* defendant sought to exclude the contents of the *road tape* only. In his written motion, defendant argued, *inter alia,* that all parties on the road tape were not identified. The trial court redacted and suppressed a statement made by Mr. Small at the end of the road tape, but otherwise denied the motion, holding that the road tape was "admissible as part of the *corpus delecti* of the crime of aggravated kidnapping." In his post-trial motion for a new trial, defendant argued that "[t]he Court erred in denying defendant's Motion in Limine" with respect to the road tape.

A brief explanation of the content of the road tape will aid in our discussion of the admissibility of this piece of evidence. Before Mr. Small was made to lie in the box that was buried in the ground, the kidnapper had him make a tape telling his wife that he had been kidnapped and that the kidnapper was requesting $1 million in ransom money. This segment of the road tape was played to Mrs. Small during the 3:30 a.m. ransom call, the first ransom call, which was not recorded.

After Mr. Small completed this message, the kidnapper made certain statements to Mr. Small which were recorded on the road tape. The kidnapper told Mr. Small, in effect, that if his wife complied with his instructions, Mr. Small would not be harmed. If, however, she failed to comply, the kidnapper told Mr. Small that "you are dead *** [a]nd I ain't coming back to dig you up." This portion of the road tape was not played to Mrs. Small on any of the ransom calls. She first heard this portion of the road tape after Mr. Small's body had been discovered.

Mr. Small was also made to record instructions as to where his wife was to drop off the ransom money once it had been obtained. This portion of the road tape was played to Mrs. Small during the 11:28 p.m. ransom call, one of the two ransom calls on the house tapes.

In closing argument, the prosecutor quoted the following from the road tape:

> " 'I ain't gone this far for nothing. If she don't pay the money you are dead. I want you to get that through your head right now. And I ain't coming back to dig you up. You have got two days of air and that's it. And it is going to get real stuffy in there.' "

These statements, made by the kidnapper to Mr. Small and recorded on the road tape, were on that segment of the road tape never played to Mrs. Small during any of the ransom calls. The prosecutor argued that these

statements were "the words of a murderer *** the words of a man who intended and planned to kill another man." The prosecutor used segments from this quote two more times during his closing argument.

The prosecutor also used comments from the house tapes to show not simply evidence of the crime, but that defendant in fact murdered Mr. Small. In closing, the prosecutor argued to the jury:

> "You remember when Mrs. Small at the [5:03 p.m.] phone call said, 'I want to talk to my husband.' The [11:28 p.m.] call, you remember, 'I want to talk to my husband. I want to talk to my husband.' At five o'clock [defendant] said, 'I can't do that.' Because no one was ever going to ever be able to talk to Stephen Small again."

The trial court ruled that the *road tape* was admissible as *corpus delecti* of the instant charges. This ruling allowed the State to introduce the contents of the tapes as *evidence* of the crimes which were the subject of the trial. The *corpus delecti*, or "body of an offense," of a crime is the body or substance of the crime. (Black's Law Dictionary 310 (5th ed. 1979).) In a homicide, the elements of the *corpus delecti* are the fact of the death and the criminal agency of another as the cause of the death. (*People v. Fedora* (1946), 393 Ill. 165.) Proof of the *corpus delecti* may be proven by direct evidence, *e.g.*, the corpse of a murdered man, or circumstantial evidence, as in the instant case, where the State used the tapes as *corpus delecti* of the kidnapping and murder.

In addition to using the tapes merely as evidence of the crimes, the State used the contents of the recordings to prove that defendant *committed* the crimes. As the State and defendant both acknowledge in their briefs, the State was not precluded from using the tapes as evidence that defendant committed the crimes as long as the proper foundation for their admission for this purpose was established.

The house tapes were recordings of the 5:03 p.m. and the 11:28 p.m. ransom calls. The general rule is that "telephone conversations, the substance of which is relevant and material to the issues, are competent provided the identity of the person with whom the conversation was had is established by direct evidence or *facts and circumstances*." (Emphasis added.) (*People v. Nichols* (1941), 378 Ill. 487, 490.) The State used the substance of the house tapes as evidence that defendant had intended to and did in fact murder Mr. Small. To be competent as this type of evidence, therefore, it was necessary for the State to have proven the identity of the caller on the tapes.

There was no direct evidence introduced at trial by which defendant was identified as the individual speaking to Mrs. Small on the house tapes. There was, however, sufficient circumstantial evidence of defendant's identity as the caller to establish the foundation by which the house tapes were admissible as evidence that defendant committed the instant charges.

Terry Dutour, an acquaintance familiar with defendant, testified at trial that he saw defendant on the telephone at the telephone booth from where the 5:03 p.m. telephone call had been made at approximately 5 p.m. on September 2. Dutour was able to recall the date because he had purchased some lottery tickets on that date. Seated in a car near the telephone booth was a white female with blonde hair. Dutour testified that he reported his sighting of defendant to a detective working on the kidnapping on September 6, 1987.

Agent Evans testified both at a pretrial hearing and at trial that he saw a white male at the telephone booth from where the 11:28 p.m. telephone call had been traced within 30 seconds of the call being placed. Evans testified that he also saw a white female with shoulder length blonde hair in an automobile (later identified as

Rish's) near the booth. That automobile with defendant and Rish inside was later seen arriving at defendant's home and defendant and Rish were seen exiting the car.

We believe that this eyewitness testimony provides compelling circumstantial evidence that defendant, in Rish's company, was the male who made the 5:03 p.m. and the 11:28 p.m. telephone calls to the Small home. (See *Michaud v. United States* (10th Cir. 1965), 350 F.2d 131, 133 (where eyewitness testimony that defendant was near a telephone booth at the time a threatening telephone call was made to the White House provided sufficient foundation for the admission of the tapes of the call).) Having proven defendant's identity, we find that the State was properly allowed to use the tapes as evidence that defendant committed the crimes for which he was charged including, *inter alia*, the murder of Mr. Small.

At trial, the road tape was played during the prosecutor's direct examination of Mrs. Small. Mrs. Small was able to identify her husband's voice on the road tape. She was also able to identify the other voice on the tape as the voice of the man she had spoken with on all four ransom calls. In light of this testimony and our decision with respect to defendant's identity on the house tapes, we find that defendant's identity was proven through circumstantial evidence, justifying the State's use of the road tape at trial.

Moreover, this court has held that when evidence is competent only for one purpose, the other party is entitled by instructions to have it limited to the purpose for which it is proper. (*Jamison v. People* (1893), 145 Ill. 357, 379; see also *Chicago, Rock Island & Pacific Ry. Co. v. Clark* (1883), 108 Ill. 113, 117-18.) If the opponent of the evidence fails to ask for an instruction confining the evidence to its legitimate sphere, he is deemed to

have waived any objection he may have. See *Eizerman v. Behn* (1956), 9 Ill. App. 2d 263, 280.

In the instant case, defendant was entitled to ask for a limiting instruction with respect to the jury's consideration of the house and road tapes as *corpus delecti* only. Having failed to do so, we find that defendant has waived any objection of the State's use of the evidence.

Defendant made a separate motion *in limine* objecting to the introduction of the Jean Small tape "on the basis of lack of foundation." The trial court denied the motion. Relying on this court's decision in *People v. Thompkins* (1988), 121 Ill. 2d 401, the trial court found that the recording of the telephone call Jean Small made to the Small home was admissible as a spontaneous declaration. In his post-trial motion for a new trial, defendant argues that "[t]he Court erred in allowing Jean Small to testify" to the conversation she had with the kidnapper and "further erred" by playing the Jean Small tape for the jury to hear.

In *Thompkins*, this court restated the test used to determine whether a statement falls within the spontaneous declaration exception to the hearsay rule. (*Thompkins*, 121 Ill. 2d at 428.) To be admissible, three elements must be present:

> " '(1) an occurrence sufficiently startling to produce a spontaneous and unreflecting statement; (2) absence of time to fabricate; and (3) the statement must relate to the circumstances of the occurrence.' " *Thompkins*, 121 Ill. 2d at 428, quoting *People v. Poland* (1961), 22 Ill. 2d 175, 181.

The record is clear that these elements were met with respect to Jean Small's conversations with Mrs. Small and with Mrs. Small's brother-in-law. In addition to the repeated use of obscenities in his conversation with Jean Small, the caller said that Mr. Small was buried in the ground and threatened a "shoot out" and a

"blood bath" if he saw police officers at the ransom site. The caller added, "If you f*** up I am coming after you and I will kill your husband." In making its ruling, the trial court noted that "even though it is not in the record at this time, the Court and the Defense Counsel is aware of the fact of the relationship between the deceased and Mrs. Jean Alice Small, would indicate that it was a startling event from her standpoint. There would apparently be insufficient time to fabricate ***."

In making its ruling, however, the trial court failed to take into consideration the admissibility of the conversation between Jean Small and the caller that she was relaying to Mrs. Small's brother-in-law. This conversation was purely a hearsay statement, tending to prove defendant's guilt of the crimes charged. It was not proper testimony and should not have been admitted. (See *People v. Vandiver* (1971), 51 Ill. 2d 525, 531.) However, we believe introduction of the tape was harmless error.

Defendant's next arguments all focus on alleged acts of misconduct by the prosecutor.

People's Exhibit 62 are wire ties commonly used to bundle wire but also used by the police to restrain individuals in the same manner as handcuffs. The State attempted to introduce these exhibits as the type of handcuff placed on Mr. Small when he was kidnapped. At trial, the court denied the State's request to admit the exhibit into evidence, ruling that there was "no indication that there is sufficient foundation for those to be admitted." At the end of the trial court's ruling the prosecutor requested permission to "indicate to the Court *** again on reconsidering *** [the admissibility of the wire ties]," to which the court responded, "Tomorrow. So I will listen to you tomorrow."

The following day, during questioning of the medical examiner, the State approached the witness with the ex-

hibit in his hand, asking the witness to examine it, at which point defendant requested a side bar. Defendant now argues in his brief to this court that the prosecutor's conduct in asking the examiner to identify the exhibit was a "flagrant, intentional and calculated" example of misconduct calling for a mistrial.

We agree with defendant's argument that the prosecutor's actions may properly be looked upon as an example of misconduct, but we do not believe defendant has sustained his burden of showing how the prosecutor's actions so infected the entire trial proceedings with fundamental unfairness as to reduce his trial to a "complete miscarriage of justice." (See, *e.g., Donnelly v. De Christoforo* (1974), 416 U.S. 637, 40 L. Ed. 2d 431, 94 S. Ct. 1868.) The proper procedure to again try to demonstrate to the trial court the relevance of the wire ties should have been accomplished by presenting the evidence in an offer of proof outside the presence of the jury. We decline, however, to view the prosecutor's improper conduct as amounting to a mistrial.

Defendant next argues that the prosecutor suggested to the jury that the defendant was attempting to conceal evidence unfavorable to his defense. We find that because the defendant failed to include this issue in his post-trial motion for a new trial, he has waived it for purposes of appeal. *People v. Enoch* (1988), 122 Ill. 2d 176, 190.

Likewise, defendant raises a number of challenges to statements made by the prosecutor in his closing argument. None of these comments, however, were raised in his post-trial motion for a new trial. We hold that defendant has waived these issues for purposes of appeal. *People v. Enoch* (1988), 122 Ill. 2d 176, 190.

Defendant was charged with three counts of first degree murder and 10 counts of aggravated kidnapping. The defendant was convicted by a general verdict and he

now argues that his conviction should be reversed because there was insufficient evidence to convict him under every count. This argument has been considered by this court on prior occasions and has consistently rejected it, creating the rule in this State that " 'where an indictment contains several counts arising out of a single transaction, and a general verdict is returned, the effect is that the defendant is guilty as charged in each count, and if the punishment imposed is one which is authorized to be inflicted for the offense charged in any one or more of the counts, the verdict must be sustained.' " (*People v. Jones* (1975), 60 Ill. 2d 300, 309, quoting *People v. Lymore* (1962), 25 Ill. 2d 305, 308; *People v. Brackett* (1987), 117 Ill. 2d 170, 179.) We decline to reconsider our decisions on this issue and hold that defendant's convictions for first degree murder and aggravated kidnapping should not be reversed on account of the jury's return of general verdicts of guilty.

Defendant next argues that he was improperly found eligible for the death penalty since the State failed to prove that he either intended to kill or knew that his acts created a strong probability of death or great bodily harm to the victim. Because defendant did not raise this argument in his motion for a new trial, the claim is now waived in the absence of plain error. (*People v. Stewart* (1984), 105 Ill. 2d 22.) Defendant maintains that because he is challenging the sufficiency of the evidence used to convict him, his failure to raise the argument in his post-trial motion does not result in a waiver. (*People v. Enoch* (1988), 122 Ill. 2d 176, 190.) In *Enoch*, however, this court held that *where no post-trial motion has been filed*, the court's review of capital cases will be limited to, *inter alia*, the sufficiency of the evidence. (*Enoch*, 122 Ill. 2d at 190.) In the instant case, defendant did in fact file a post-trial motion, and as this court also stated in *Enoch*, "the general rule [is] that the failure to raise

an issue in a written motion for a new trial results in a waiver of that issue on appeal." (*Enoch*, 122 Ill. 2d at 186.) Moreover, as has been noted above, the criterion for examining this issue under the plain error rule does not apply since the evidence in this case is not closely balanced. (*People v. Mack* (1984), 105 Ill. 2d 103.) The trial evidence overwhelmingly established that defendant's original intention was to kill Mr. Small. At the very least, the evidence proved that defendant knew that the act of placing his victim under the ground in a sealed box created a strong probability of death or great bodily harm to Mr. Small.

Defendant acknowledges that the evidence showed only that he intended to kidnap Mr. Small for $1 million ransom, and in the course of that kidnapping, Mr. Small, in defendant's words, "accidently died." Defendant ordered Mr. Small to lie down in a box buried in the ground that was approximately six feet long and three feet wide. An "air pipe" passed through the side of the box and ran approximately 25 feet along the ground before being exposed to air. Defendant now contends that Mr. Small "accidentally died" because the pipe was too long.

Defendant fails to point out that the evidence also established that the pipe was butted flush against a wooden plank built into a box within the box in which Mr. Small was buried. For this reason, Mr. Small was unable to get adequate oxygen, even if the pipe had been shorter. We reject defendant's assertion that it requires the expertise of a "diver or snorkler" to understand that suffocation is inevitable in these circumstances. Defendant's construction of the air pipe demonstrates his own "expertise" that placing Mr. Small under the ground in a sealed box created a strong probability of death or great bodily harm through suffocation.

In the road tapes played at trial, defendant was heard telling Mr. Small that he had "48 hours of air" inside the grave and that he would not return to "dig [him] up." In fact, defendant made no moves to rescue Mr. Small once the 48 hours had expired. Defendant's own words demonstrate his knowledge that Mr. Small would die, and his inaction establishes his abandonment of his victim to die.

Defendant acknowledges that, in order to be eligible for the death penalty, the evidence need only show that he acted with knowledge of creating a strong probability of death or great bodily harm. (See *People v. King* (1986), 109 Ill. 2d 514; *People v. Owens* (1984), 102 Ill. 2d 88; *People v. Eddmonds* (1984), 101 Ill. 2d 44.) However, defendant attempts to distinguish the foregoing cases on the basis that those defendants all inflicted violence upon their victims. In contrast, defendant asserts that his "was not a violent act."

Defendant buried Mr. Small alive in a practically airless coffin. The evidence showed that Mr. Small fiercely struggled, possibly for several hours, to free himself from his grave. We believe that it is difficult to envision a more violent death than that suffered by Mr. Small.

Defendant next argues that his eighth and fourteenth amendment rights were violated when the trial court ruled that videotapes of defendant's children were inadmissible at the death penalty stage of his trial. The trial court ruled that there was insufficient foundation for the tapes' admissibility. The trial court did not view the tapes. We find that the trial court did not abuse its discretion in ruling on the admissibility of the tapes and properly found that the evidence was not reliable.

A defendant is entitled to present evidence in mitigation at a capital sentencing hearing that is relevant to his character. (*Lockett v. Ohio* (1978), 438 U.S. 586, 57 L. Ed. 2d 973, 98 S. Ct. 2954.) The only qualification to

this entitlement is that the evidence must be reliable. *People v. Free* (1983), 94 Ill. 2d 378; Ill. Rev. Stat. 1987, ch. 38, par. 9—1(e).

The tapes were of defendant's children, a son 11 years old and a daughter 8 years old. Defendant conceded that neither child had sworn an oath promising to tell the truth before being interviewed.

The State had no opportunity to cross-examine the witnesses. The children had each been interviewed for an hour, which interviews were taped. These interviews were then edited and the edited versions of the children's interviews (which ran for a combined total of 20 minutes) were what defendant sought to have introduced as mitigation evidence. Neither the State nor defendant had an opportunity to view the unedited tapes of the one-hour interviews.

In any situation where the testimony of a young child is offered into evidence, concerns about reliability will be present. Here, we conclude that these concerns were present and may in fact have been exaggerated by the fact the State was unable to cross-examine the children or establish what the children had been told about their father's circumstances before they were interviewed.

Moreover, we believe that the State's offer to stipulate to the substance of the children's tapes as well as to whatever impact defendant wanted to convey by introducing the tapes would have established whatever substantive mitigating evidencing defendant sought to establish by introduction of the tapes. Defendant chose not to agree to this stipulation without offering any reason why. He has failed to show how the trial court's ruling on this issue prejudiced him which, in any event, this court concludes could have been avoided had he agreed to the State's stipulation.

Defendant argues that the prosecutor made numerous improper statements at the second stage of defendant's

capital sentencing hearing. We find that defendant has waived these issues for purposes of our review based, in some instances, on his failure to object to these statements at the hearing or on his failure to object to the challenged statements *and* his failure to include the issue in his motion for a new trial. (*People v. Stewart* (1984), 105 Ill. 2d 22.) Again, we find that the evidence in the instant case is not closely balanced and the plain error rule is inapplicable.

Defendant argues that the trial court improperly allowed the jury to consider at the sentencing hearing evidence that defendant gave money to certain Kankakee jail guards in order to meet and have sexual intercourse with Rish. Defendant argues that he objected at trial to the introduction of this evidence.

Our review of the record indicates that defendant did not object to this evidence at trial. Rather, he objected to the introduction of evidence of his past drug dealing. He did not object to evidence of his activities while he was incarcerated in the Kankakee jail awaiting trial on the instant charges. The only evidence concerning defendant's jailhouse behavior which counsel objected to involved a weapon, and that evidence was not introduced by the State. Defendant also failed to include this argument in his motion for a new trial. We therefore hold that this issue is waived for purposes of appeal. *People v. Enoch* (1988), 122 Ill. 2d 176, 190.

Defendant argues that he was denied a fair sentencing hearing under the eighth and fourteenth amendments by the trial court's denial of defendant's motion to present opening and closing arguments at the death penalty sentencing hearing. This court considered and rejected this argument in *People v. Williams* (1983), 97 Ill. 2d 252. As defendant has presented no persuasive reasons for reconsideration, we decline to do so.

Finally, defendant argues that the Illinois death penalty is unconstitutional because it does not sufficiently minimize the risk of arbitrarily or capriciously imposed death sentences. As defendant points out in his brief to this court, this court has previously rejected this argument many times. (See, *e.g., People v. Whitehead* (1987), 116 Ill. 2d 425; *People v. Albanese* (1984), 102 Ill. 2d 54; *People v. Davis* (1983), 95 Ill. 2d 1; *People ex rel. Carey v. Cousins* (1979), 77 Ill. 2d 531.) Because defendant presents no convincing reasons for reconsideration, this court upholds the constitutionality of the death penalty and affirms defendant's sentence of death.

For the reasons set forth above, we affirm defendant's convictions and sentences of death and imprisonment. We direct the clerk of this court to enter an order setting Wednesday, November 13, 1991, as the date on which the sentence of death entered by the circuit court of Kankakee County is to be carried out. Defendant is to be executed in the manner provided by section 119—5 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1987, ch. 38, par. 119—5). The clerk of this court is to send a certified copy of this mandate to the Director of Corrections, to the warden of Stateville Correctional Center, and to the warden of the institution wherein the defendant is confined.

*Affirmed.*

JUSTICES CALVO, BILANDIC and FREEMAN took no part in the consideration or decision of this case.